IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

BARBARA L. WALLACE,

        Plaintiff,

V.                                          CIVIL ACTION NO. 3:04-0453

JOANNE BARNHART,
Commissioner of Social Security,

        Defendant.

**FINDINGS AND RECOMMENDATION**

In this action, filed under the provisions of 42 U.S.C. §1383(c)(3), plaintiff seeks review of the final decision of the Commissioner of Social Security denying her application for supplemental security income based on disability. The case is presently pending before the Court on cross-motions of the parties for judgment on the pleadings.

Plaintiff filed her application on August 26, 2002, alleging disability as a consequence of asthma, allergies, tennis elbow, seizures, back pain, depression, arthritis and migraine headaches. On appeal from an initial and reconsidered denial, an administrative law judge, after hearing, found plaintiff not disabled in a decision which became the final decision of the Commissioner when the Appeals Council denied a request for review. Thereafter, plaintiff filed this action seeking review of the Commissioner's decision.

At the time of the administrative decision, plaintiff was thirty-nine years of age and had obtained an eighth grade education. She has no past relevant employment experience. In his

decision, the administrative law judge determined that plaintiff suffers from "seizures, asthma, and chronic back pain," impairments he considered severe. Concluding that plaintiff retained the residual functional capacity for a significant range of light level work and relying on Rule 202.17 of the medical-vocational guidelines[1] and the testimony of a vocational expert, the administrative law judge found her not disabled.

From a review of the record, it is apparent that substantial evidence supports the Commissioner's decision. In hearing testimony, plaintiff reported that seizures and asthma bother her the most. Throughout the record, however, plaintiff's reports about the frequency and nature of her seizures have been inconsistent. A seizure questionnaire she completed in September of 2002 reflects that she last experienced a seizure on September 3, 2002, and before that three months earlier. She wrote that she had experienced two seizures in the last six months and three in the last twelve months. In a seizure description form completed by her husband on September 17, 2002, he reported that plaintiff had seizures every three to four months. A second questionnaire completed by plaintiff in December 2002, just three months after the first, contains her report that she had two seizures in December, nine in the last six months and twelve in the last year. Her husband reported on December 22, 2002, that her seizures occurred two to three times per month. He also indicated that the seizures lasted only one to two minutes whereas in September he had reported they were five to ten minutes in duration.

Another unexplained inconsistency in plaintiff's reports involves the issue of when doctors advised her to quit driving. She reported during a consultative psychological evaluation on July 18, 2000, that she had been told in June of 1999 she should no longer drive and she felt this was

---

[1] 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 2.

when she became disabled. She reported at the September 26, 2003 hearing, however, that she had not driven for one and one-half years since her doctor advised her to stop due to her seizure disorder. She also stated she had renewed her driver's license two years earlier which is well beyond the onset of her dizzy spells and the time she originally reported she had been advised to quit driving. A July 27, 2001 report from Dr. Ahmad, a neurologist, reflects his advice to plaintiff that she stop driving.

Dr. Robert Holley, who began treating plaintiff in at least January of 1993, reported on October 10, 2002 that he had been following her for several conditions, including a seizure disorder, but his reports do not appear to reflect this.[2] Similarly, findings from Holzer Clinic visits between April of 2001 and July 18, 2002, do not contain any information relative to plaintiff's seizures. EEG studies performed on June 9, 1999 and August 16, 2001, though showing moderate left temporal abnormalities, were interpreted as not demonstrating any definitive epileptiform activity.

As noted, Dr. Ahmad treated plaintiff on approximately six occasions between July 27, 2001 and January 9, 2003. His reports reflect that once he started plaintiff on the medication Neurontin on August 16, 2001, her seizures basically ceased. In November of 2001, though reporting occasional dizziness, plaintiff stated she had not experienced any passing out spells. Similarly, in March and August of 2002, plaintiff reported no further incidents and her neurological exams were within normal limits. She related having "very occasional" dizziness relieved by lying down on the latter date. On January 9, 2003, plaintiff related having two episodes when she felt

---

[2] His reports contain both a handwritten and typed portion, with the complaint, diagnosis and medications given being handwritten, and, unfortunately, mostly illegible. The typed portions reflect the physical exam findings but do not document neurological abnormalities or any indication of problems related to seizures.

dizzy but did not pass out. Based on these reports, it appears that plaintiff did not have any seizures in 2002 which again is in conflict with the questionnaires she completed in September and December of that year as well as the reports from her husband.

In April of 2003, plaintiff was seen at Ebenezer Medical Outreach seeking treatment for headaches and seizures. Again, her claims are inconsistent as she told the nurse practitioner that she had been without medication for eight months, which would have meant she had not taken anything since sometime in August of 2002. The reports from Dr. Ahmad from August 2002 and January 2003 contradict this assertion as they reveal that plaintiff was continuing to take Neurontin during this time. At the most, she would have been without medication for three months or less,[3] and she reported at Ebenezer that, despite having no medication, she had not suffered any seizures in the previous few months.

On October 15, 2003, plaintiff reported at another consultative psychological exam that she was experiencing seizures about three times per month. Approximately two weeks later, she reported to Dr. Gobunsuy, during a consultative physical exam, that she had not had a passing out spell since last August (2003), when she had three seizures after having two the previous month. She also related that when experiencing one of these episodes she simply goes limp when she passes out and does not have a convulsion. She also told this evaluator that she does not experience urinary incontinence despite having reported, along with her husband, in September and December of 2002, that she did have urinary incontinence with these episodes. It is further noted that, at the hearing, plaintiff testified that her seizure medication helped to control the occurrences of her seizures.

---

[3] The report of consultative psychological evaluation conducted on February 4, 2003, reflects that plaintiff was on no medication at that time because she had lost her medical card.

The administrative law judge, after considering this evidence and noting that objective cardiac work-up and EEG studies had been normal, concluded plaintiff's alleged seizure disorder was not a "severe" impairment. It is apparent, however, that, even though he made this finding, he took it into account when assessing plaintiff's residual functional capacity as he found that she should avoid work around heights and dangerous machinery.

Noting that the record demonstrates plaintiff has a history of suffering chronic sinusitis as well as allergic rhinitis and asthma, and considering that she is prescribed inhalers and allergy medication, the administrative law judge found her breathing impairment "severe" and it contributed to his finding that she would be restricted to a limited range of light level work.

While the record also reflects a history of treatment for migraines, which plaintiff testified she still experienced, the more recent medical reports do not reflect that this is a significant problem for her. The reports from Dr. Holley document frequent sinusitis and allergy-related problems, and an examining physician at the Holzer Clinic expressed the opinion that plaintiff's headaches were likely related to chronic sinusitis. While a February 21, 2004 report from Ebenezer Medical Outreach documents plaintiff's complaint of a headache lasting two weeks, it also reflects her report that her headaches had responded well in the past to the medication Imitrex, which she was not then taking, but it was prescribed.

Although plaintiff reported difficulty with back pain and arthritis in her hips, she took only Tylenol for this pain, according to her testimony. Dr. Holley's reports contain occasional findings of tenderness in the left knee, back and elbows, but without restriction of motion or gait abnormalities. Some diminution in ability to squat was documented, however. When evaluated by Dr. Gobunsuy in November of 2003, plaintiff characterized her back pain as "off and on." He

observed some tenderness in the thoracic spine but without range of motion limitation. He diagnosed lumbar strain but further commented that plaintiff had no indication of spinal curvature, despite her allegation of this at the hearing. No swelling or tenderness was detected in the elbows or hips. Given the minimal objective findings and conservative treatment plaintiff has received for hip, knee and elbow pain, the administrative law judge determined these were not "severe" impairments. He did nonetheless find that her back pain would result in limitations on her abilities to lift, stand, walk and perform postural activities.

The administrative law judge adopted the residual functional capacity assessment completed by Dr. Gobunsuy following his consultative exam. This consists of findings of an ability to lift/carry thirty pounds occasionally, twenty-five frequently; stand and walk a total of four hours per day at thirty minute intervals; sit for unlimited periods; occasionally stoop, crouch, kneel and crawl; and, a need to avoid work around heights, moving machinery, temperature extremes, chemicals, dust, fumes and humidity. These findings clearly have substantial support in the record. In making this determination, the administrative law judge noted a residual functional capacity assessment from Dr. Wagner, who plaintiff identified at the hearing as her current treating physician. It is observed there were no reports from this physician submitted and, hence, no support for his very restrictive assessment. Also, as the administrative law judge noted, Dr. Wagner indicated on the assessment form that his findings were based on a discussion of plaintiff's abilities with her and, therefore, may not necessarily have any medical basis. The administrative law judge's decision to give this assessment very little weight is obviously well-supported by the evidence.

In addition to the physical limitations found by the administrative law judge, he determined that, from a mental standpoint, plaintiff would have a "poor" (seriously limited but not

precluded) ability to understand, remember and carry out detailed and complex job instructions. This limitation, as well as a "fair" (limited but satisfactory) ability to perform most other work-related mental functions, was assessed by Elizabeth Durham, M.A., who examined plaintiff for the Commissioner on October 15, 2003, shortly after the hearing, and observed characteristics she felt were consistent with a depressive disorder, not otherwise specified. Another examiner, Catherine V. Sayre, M.A., who evaluated plaintiff in February of 2003, also made this diagnosis. While she additionally found evidence of a panic disorder with agoraphobia, it is observed that this exam was the only time plaintiff alleged having panic attacks. While the administrative law judge determined her depressive disorder was "severe," he noted that plaintiff has had no treatment for any of her alleged mental problems. The Court concludes that his findings as to work-related mental limitations are amply supported by the evidence.

   While plaintiff alleged significant limitations on her activities as a result of seizures, shortness of breath and pain, the administrative law judge, taking account of the evidence as well as his observations of plaintiff at the hearing, concluded that her credibility was only fair. Significant considerations in making this finding were plaintiff's relatively normal daily activities, over-the-counter medication, lack of alternative treatment for her impairments, minimal abnormal objective findings and inconsistencies in her reports about her conditions, especially her seizures, which the evidence suggests were controlled with medication when she took it properly. In view of the evidence, and taking account of the administrative law judge's "opportunity to observe the demeanor and to determine the credibility of the claimant," these findings are entitled to "great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). Finally, in response to hypothetical questioning propounded via interrogatories, which included plaintiff's age, education, work

experience and a reasonably accurate profile of her functional capacity and overall medical condition, a vocational expert testified that there were significant numbers of light and sedentary jobs in the national economy which plaintiff could perform, consistent with her prior hearing testimony.

Resolution of conflicts in the evidence is within the province of the Commissioner, not the courts, Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964), and if the Commissioner's findings are supported by substantial evidence this Court is bound to uphold the decision. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). In the present case, the evidence, though somewhat conflicting, provides substantial support for the Commissioner's findings with respect to plaintiff's impairments and residual functional capacity. Under such circumstances, the decision of the Commissioner should be affirmed.

## **RECOMMENDATION**

In light of the foregoing, it is **RESPECTFULLY RECOMMENDED** that plaintiff's motion for judgment on the pleadings be denied, that the like motion of defendant be granted and the decision of the Commissioner affirmed.

Plaintiff and defendant are hereby notified that a copy of these Findings and Recommendation will be submitted to the Honorable Robert C. Chambers, United States District Judge, and that, in accordance with the provisions of Rule 72(b), Fed.R.Civ.P., the parties may, within thirteen days of the date of filing these Findings and Recommendation, serve and file written objections with the Clerk of this Court, identifying the portions of the Findings and

Recommendation to which objection is made and the basis for such objection. The judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made in accordance with the provisions of 28 U.S.C. §636(b) and the parties are advised that failure to file timely objections will result in a waiver of their right to appeal from a judgment of the district court based on such Findings and Recommendation. Copies of objections shall be served on all parties with copies of the same to Judge Chambers and this Magistrate Judge.

The Clerk is directed to file these Findings and Recommendation and to mail a copy of the same to all counsel of record.

DATED: June 22, 2005

*/s/ Maurice S. Taylor, Jr.*
MAURICE G. TAYLOR, JR.
UNITED STATES MAGISTRATE JUDGE